**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

ARCO/MURRAY NATIONAL
CONSTRUCTION COMPANY, INC.,
      **Plaintiff,**

v.                                    Civil Action No. 2:21-cv-00346

OWL CREEK ENERGY, LLC, *et al.*,
      **Defendants.**


**OPINION AND ORDER**

In this construction case, Plaintiff ARCO/Murray National Construction Company, Inc., a

general contractor ("ARCO/Murray" or "Contractor"), sued Owl Creek Energy, LLC ("Owl

Creek" or "Owner") for a balance due under a contract to build a manufacturing facility in Virginia

Beach. Owl Creek counterclaimed, alleging ARCO/Murray breached the contract through

defective performance. The matter is now before the court to resolve Owl Creek's motion for

partial summary judgement on ARCO/Murray's claims for delay damages. (ECF No. 85). Owl

Creek argues that ARCO/Murray is not entitled to the $402,790.00 in delay damages it seeks to

recover because it failed to provide notice of the delays, cannot prove Owl Creek caused the delays,

and waived delay damage claims when it submitted lien waivers for payment. Def.'s Br. Supp.

Mot. Partial Summ. J. ("Def.'s Br.") (ECF No. 86, at 2). ARCO/Murray opposed the motion,

("Pl.'s Opp'n") (ECF No. 91), and Owl Creek replied, ("Def.'s Reply") (ECF No. 92). Neither

party requested oral argument, and I do not find that argument would aid the decision-making

process. Local Civ. R. 7(j). After reviewing the parties' briefs and accompanying exhibits, I

conclude that there are genuine disputes of material fact as to whether ARCO/Murray is entitled

to delay damages. Accordingly, for the reasons detailed below, the court DENIES Owl Creek's motion for partial summary judgment. (ECF No. 85).

## I.   BACKGROUND

On January 4, 2019,[1] Owl Creek and ARCO/Murray entered into a contract[2] under which ARCO/Murray would design and construct a 500,000 square foot manufacturing facility in Virginia Beach, Virginia for Owl Creek ("the Project"). Def.'s Br., Ex. 1 ("Contract") (ECF No. 86-1, at 2). The Contract initially called for substantial completion of the Project "on or before July 12, 2019," with final completion to "be achieved as expeditiously as reasonably practicable."[3] Id. at 5. Of the $26 million total original cost for the Project, the Contract required Owl Creek to

---

[1] This summary recites facts articulated in the briefing, resolving disputes of fact in favor of ARCO/Murray as the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

[2] The contract consists of many documents in the collective. Contract (ECF No. 86-1, at 3). The main provisions of the contract are found in two separately executed instruments, respectively titled "Modified Form of Agreement Between Owner and Design-Builder – Cost Plus Fee with an Option for a Guaranteed Maximum Price," ("Base Contract") and "Modified Form of General Conditions of Contract Between Owner and Design-Builder" ("General Conditions"). Id. at 1–38. The contract also encompasses the 12 exhibits accompanying the Base Contract and General Conditions, which include a Project schedule, design specifications, various lien waivers, a cost schedule, insurance requirements, and other miscellaneous documents not relevant to this motion. Id. at 3.

[3] By the terms of the contract, substantial completion means that "the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Work or a portion thereof for its intended purposes or upon issuance of a Temporary Certificate of Occupancy, whichever occurs first." Contract, (ECF No. 86-1, at 15). Final completion means that "all Work is complete in accordance with the Contract Documents, including but not limited to, any items identified in the punch list prepared under Section 6.6.1 and the submission of all documents set forth in Section 6.7.2." Id. at 14. The punch list required by Section 6.6.1 details "all remaining incomplete or defective work that does not prevent Owner from utilizing the Work for its intended purpose." Id. at 27. The documents set forth in Section 6.7.2 include an affidavit confirming that there are no claims, liens, or outstanding debts on the property; a final lien waiver; all operating manuals and warranties; and Certificates of Insurance. Id. at 28.

2

pay $815,431.00 to ARCO/Murray as compensation for the design-builder's General Conditions.[4]
Id. at 73–75, 92–93.

On January 4, 2019—the same date the parties executed the Contract—ARCO/Murray and Owl Creek executed Change Order 1, which changed the deadline for substantial completion to March 25, 2020. Def.'s Br., Ex. 2 (ECF No. 86-2, at 1). It also increased the amount of payment for ARCO/Murray's General Conditions by $350,000.00 to compensate for the extended substantial completion date. Id. at 2. Thereafter, the parties executed eleven additional Change Orders, none of which changed the substantial completion date of March 25, 2020. See Def.'s Br., Ex. 3 (ECF No. 86-3).

While the Project was underway, ARCO/Murray provided Owl Creek with several updates about the Project's progress and timeline for completion. As required by the Contract,[5] ARCO/Murray sent "Weekly Updates" to Owl Creek about the ongoing work, each of which included an "Open Issue Log" cataloging "outstanding critical items" requiring action by Owl Creek. See Pl.'s Opp'n, Ex. 6A–6E (ECF Nos. 91-6–91-10). On at least 24 occasions, ARCO/Murray advised Owl Creek of "overdue" action items and asked for prompt responses. Id. On nearly all these occasions, ARCO/Murray also informed Owl Creek that the overdue items were "impacting [its] ability to schedule activities and notify subcontractors of upcoming work." Id. Additionally, on at least two occasions, ARCO/Murray sent revised Project schedules to Owl Creek showing that completion of the Project would be delayed beyond the March 25, 2020,

---

[4] ARCO/Murray's General Conditions included expenses for "project management, field supervision, field engineering, testing services, temporary utilities, construction cleaning, and travel expenses." Contract (ECF No. 86-1, at 73, 92).

[5] Section 1.9 of the Project's Outline Specifications—which were included in the contract as Exhibit A—states that "ARCO shall provide electronic weekly updates (PDFs) and progress photos during the project." Contract (ECF No. 86-1, at 45).

completion date set by Change Order 1. See Pl.'s Opp'n, Ex. 4 (ECF No. 91-4, at 3–4) (sent November 12, 2019, showing Project completion on June 19, 2020); Pl.'s Opp'n, Ex. 3 (ECF No. 91-3, at 3–4) (sent February 7, 2020, showing Project completion on July 2, 2020). When the March 25, 2020, deadline arrived, the Project had not yet reached substantial completion. On May 21, 2020, ARCO/Murray sent Owl Creek another revised schedule, this time showing a Project completion date of August 5, 2020. Pl.'s Opp'n, Ex. 2 (ECF No. 91-2, at 3–4).

Additionally, throughout its time working on the Project, ARCO/Murray submitted a number of applications for payment to Owl Creek, each accompanied by a lien waiver in which ARCO/Murray "waive[d] and release[d] any and all lien, and claim or right to lien" on the Project "under the Statutes of the State of Virginia relating to Mechanics' Liens, on account of labor or materials, or both." Def.'s Br., Exs. 14, 17–19 (ECF Nos. 86-14, 86-17–86-19). The first relevant waiver was executed on July 31, 2020, in the amount of $899,621.40. Def.'s Br., Ex. 14 (ECF No. 86-14).

On July 28, 2020, after the Contract date of substantial completion, but with the Project still ongoing, ARCO/Murray's Director of Operations, Tom Strickland, prepared a document titled "General Conditions Summary – Owl Creek Energy." Def.'s Br., Ex. 5 ("General Conditions Summary") (ECF No. 86-5, at 2). In the document, Strickland explained that, "[d]uring the process of construction, ARCO claimed 91 weather days"—20 of which were already accounted for in the original extended substantial completion date of March 25, 2020. Id. That left an unaccounted-for delay of 71 days, which pushed the Project's completion date to July 6, 2020.[6] Id. Strickland acknowledged that, per the Contract, ARCO could not be reimbursed for General Conditions

---

[6] July 6, 2020 is 73 days past the March 25, 2020 completion date, which accounts for the 71 lost weather days and two days off for Memorial Day and Independence Day. General Conditions Summary (ECF No. 86-5, at 2).

associated with this 71-day weather delay. Id. However, he explained that ARCO/Murray's most recent Project schedule[7] showed a completion date of September 17, 2020, which was 11 weeks after the weather-adjusted completion date of July 6, 2020. Id. Strickland asserted that this 11-week delay resulted from "changes and delays in decisions from [Owl Creek]," and also stated that ARCO/Murray was experiencing "approximately 2 weeks" of additional delay due to COVID-19. Id. "To handle these changes/delays," Strickland requested "an extension of [ARCO/Murray's] general conditions costs" in the amount of $152,790.00. Id. The parties met on July 28, 2020, to discuss Strickland's General Conditions Summary. See Pl.'s Opp'n., Ex. 26 (ECF No. 91-30, at 2, 5). On August 4, 2020, the General Conditions Summary was formally sent to Owl Creek via email. Pl.'s Opp'n, Ex. 5 (ECF No. 91-5, at 2). On August 18, 2020, ARCO/Murray appears to have sent Owl Creek proposed Change Order 8, which included a line item for the cost increase requested in the General Conditions Summary.[8] Pl.'s Opp'n, Ex. 26 (ECF No. 91-30, at 5).

On August 26, 2020, in response to Owl Creek's request for an updated schedule, ARCO/Murray stated in an email that "[t]here are some items that we do not have answers/resolutions to that may affect the schedule." Pl.'s Opp'n, Ex. 7 (ECF No. 91-11, at 3).

---

[7] Strickland claimed in the General Conditions Summary that this version of the Project schedule was sent to Owl Creek on July 22, 2020. General Conditions Summary (ECF No. 86-5, at 2).

[8] In its brief, Owl Creek argues that, "[a]s of February 2021, the only writing that ARCO provided to OCE regarding its request for additional General Conditions was [the General Conditions Summary] that it alleges it delivered to OCE on August 4, 2020." Def.'s Br. (ECF No. 86, at 6). In its opposition brief, ARCO/Murray disputes this claim and provides a list of documents that, in its view, provided notice to Owl Creek of the request for a General Conditions increase before February 2021. Pl.'s Opp'n (ECF No. 91, at 7–8). While proposed Change Order 8 is not one of the documents in the list, in a separate portion of its brief, ARCO/Murray claims that it "included the $152,790.00 in proposed Change Order 008," citing an email in which it appears to have forwarded proposed Change Order 8 to Owl Creek. Id. at 7. Owl Creek does not respond to this claim in its reply brief or address whether it ever received proposed Change Order 8. See generally Def.'s Br. (ECF No. 86). The version of Change Order 8 that was eventually executed by both parties in October 2020 did not include a line item for the General Conditions increase. See Def.'s Br., Ex. 3 (ECF No. 86-3, at 16–17).

When pressed for the specific items that would delay the schedule, ARCO/Murray told Owl Creek on August 27, 2020, that it "cannot finish" without "answers/direction" on "everything we've been talking about for the last two months." Id. at 2–3. In that same email, ARCO/Murray also expressed frustration with Owl Creek, explaining that "[i]t seems like many of our questions continued to be answered with other questions . . . and we can't get done." Id. at 2. A few days later, on September 1, 2020, ARCO/Murray emailed Owl Creek a revised schedule showing Project Completion on October 8, 2020. Pl.'s Opp'n, Ex. 8 (ECF No. 91-12, at 2–3). In the email, ARCO/Murray advised Owl Creek that it "needs to have appropriate change orders issued and decisions made on open items in order to achieve" the attached schedule. Id. at 2.

On October 16, 2020, ARCO/Murray obtained a Temporary Certificate of Occupancy from the City of Virginia Beach, which achieved substantial completion of the Project under the terms of the Contract. See Def.'s Br., Ex. 8 (ECF No. 86-8); Contract, (ECF No. 86-1, at 15). However, at that time, ARCO/Murray had not yet reached final completion of the Project and therefore continued its work on the site. See Def.'s Br., Ex. 6, at 115:6–11 (ECF No. 86-6, at 20); Def.'s Br., Ex. 10, at 107:10–25; 117:2–14 (ECF No. 86-10, at 4–5). ARCO/Murray later executed lien waivers on October 30, 2020, in the amount of $535,366.13, Def.'s Br., Ex. 16 (ECF No. 86-16, at 7); December 3, 2020, in the amount of $798,092.23, Def.'s Br., Ex. 17 (ECF No. 86-17); and February 2, 2021, in the amounts of $600,141.51 and $174,711.03, Def.'s Br., Exs., 18–19 (ECF Nos. 86-18–86-19).

On April 2, 2021, ARCO/Murray sent Owl Creek a proposed Change Order Number 13, which requested, among other line items, $152,790.00 for the July 2020 General Conditions increase outlined in the General Conditions Summary, and $250,000.00 for a General Conditions Increase to February 2021 because of continued delays. Def.'s Br., Ex. 11 (ECF No. 86-11). Owl

6

Creek never agreed to or executed the proposed Change Order Number 13, and never paid ARCO/Murray the amounts requested therein. See Def.'s Br. (ECF No. 86, at 6); Pl.'s Opp'n (ECF No. 91, at 7). ARCO/Murray continued working on the Project until May 2021. See Def.'s Br., Ex. 6, at 115:6–11 (ECF No. 86-6, at 20); Def.'s Br., Ex. 10, at 107:10–25; 117:2–14 (ECF No. 86-10, at 4–5).

On June 23, 2021, ARCO filed suit against Owl Creek for breach of contract, unjust enrichment, and enforcement of mechanic's liens, seeking, in part, damages for the alleged Project delays. Am. Compl. ¶¶ 23–27 (ECF No. 1).[9] On October 7, 2022, Owl Creek moved for partial summary judgment on ARCO/Murray's claim for delay damages, (ECF No. 85), on the grounds that ARCO/Murray failed to provide notice of the delays, cannot prove Owl Creek's caused the delays, and waived all delay damage claims. Def.'s Br. (ECF No. 86, at 2). ARCO/Murray contends that all three of these arguments fail at the summary judgment stage. Pl.'s Opp'n (ECF No. 91, at 2).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass,

---

[9] On June 24, 2021, one day after filing its original complaint, ARCO/Murray filed an Amended Complaint adding Lewis Electrical Contractors, Inc., and Wiegmann & Associates Inc. as defendants. Am. Compl. ¶¶ 23–27 (ECF No. 1, at 5–6). The Amended Complaint contains the same delay damage claims alleged in the original Complaint. Compare Am. Compl. ¶¶ 23–27 (ECF No. 8) with Compl. ¶¶ 21–25 (ECF No. 1).

242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-24. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

Rule 56 permits partial summary judgment on claims and defenses. Fed. R. Civ. P. 56(a). "A motion for partial summary judgment utilizes the same standards required for consideration of a full motion for summary judgment." Pettengill v. United States, 867 F. Supp. 380, 381 (E.D. Va. 1994) (citing Gill v. Rollins Protective Servs., 773 F.2d 592, 595 (4th Cir. 1985), amended, 788 F.2d 1042 (4th Cir. 1986); Fed. R. Civ. P. 56(d)). Partial summary judgment expedites the trial process:

> "[P]artial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up litigation

> by" narrowing the issues for trial to those over which there is a
> genuine dispute of material fact.

J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. P'ship, 115 F. Supp. 3d 593, 599 (D. Md. 2015) (quoting

Rotorex Co. v. Kinsbury Corp., F. Supp. 2d 563, 571 (D. Md. 1999)). It "avoid[s] a useless trial

of facts and issues over which there was really never any controversy and which would tend to

confuse and complicate a lawsuit." In re Norfolk, Balt. & Carolina Line, Inc., 478 F. Supp. 383,

386 (E.D. Va. 1979) (quoting Lucia Steel & Trad. Corp. v. Ford, 9 F.R.D. 479, 481 (D. Neb.

1949)).

### III.   ANALYSIS

As noted above, Owl Creek argues that ARCO/Murray's claim for delay damages

> fails as a matter of law for three separate reasons: (1) ARCO failed
> to provide the contractually required written notice to OCE
> regarding the alleged delays; (2) ARCO cannot prove that the
> alleged OCE delays impacted the Project's completion date; and (3)
> ARCO expressly waived its claims to this additional compensation
> through lien waivers it executed during the project.

Def.'s Br. (ECF No. 86, at 2). ARCO/Murray contends that "[e]ach argument fails on summary

judgment." Pl.'s Opp'n (ECF No. 91, at 2). As discussed below, I am not persuaded that Owl

Creek's arguments on notice, causation, or waiver warrant summary judgment on ARCO/Murray's

delay damages claim, and therefore conclude that Owl Creek's motion for partial summary

judgment should be denied.

**A.    There is a genuine dispute of material fact about whether ARCO/Murray provided
notice of the Project delays underlying its claim for delay damages.**

Owl Creek first argues that ARCO/Murray's claim for delay damages should fail "because

ARCO did not notify OCE of such delays and the basis for its claim for relief." Def.'s Br. (ECF

No. 86, at 15). In Owl Creek's view, ARCO/Murray was required to provide such notice under

Section 10.1.1 of the contract.  Id. at 3–4, 15.  That section, titled "Requests for Contract Adjustments and Relief," states that:

> If either [ARCO/Murray] or [Owl Creek] believes that it is entitled to relief against the other for any event arising out of or related to the Work or Project, such party shall provide written notice to the other party of the basis for its claim for relief.  Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract.  In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed twenty-one (21) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later.  Such notice shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

Contract, (ECF No. 86-1, at 32).

Citing McDevitt & St. Co. v. Marriott Corp., 713 F. Supp. 906, 919 (E.D. Va. 1989), aff'd in part, rev'd in part, 911 F.2d 723 (4th Cir. 1990), Owl Creek contends that "Virginia law strictly enforces contractual requirements to provide notice" like the one contained in Section 10.1.1. Def.'s Br. (ECF No. 86, at 15).  According to Owl Creek, ARCO failed to provide "written notice to OCE within twenty-one days of the alleged delay events" or any documents "that would advise OCE of circumstances giving rise to a claim of specific contractual adjustment or relief . . . for extended general conditions."  Def.'s Br. (ECF No. 86, at 16).  In Owl Creek's view, that failure entitles Owl Creek to summary judgment on ARCO/Murray's claim for delay damages.  Id.

ARCO/Murray disagrees, arguing that Section 10.1.1 does not apply and, in the alternative, that Section 10.1.1 does not bar the Contractor's claim for delay damages.  Pl.'s Opp'n (ECF No. 91, at 19).  Regarding the first of those two arguments, ARCO/Murray contends that Section 8.2, titled "Delays to the Work,"—rather than Section 10.1.1—is the controlling provision of the

contract. Id. Section 8.2.2 states that ARCO/Murray "shall . . . be entitled to an appropriate adjustment of the Contract Price to the extent that the Contract Time[10] is extended due to Excused Delays[11] beyond the original Contract Time set forth herein." Contract (ECF No. 86-1, at 30–31). According to ARCI/Murray, the Contract Time was extended because of Excused Delays— including delays caused by Owl Creek and its agents. Pl.'s Opp'n (ECF No. 91, at 20).

Section 8.2.3 then reads: "[ARCO/Murray] shall provide written notice of events giving rise to Excused Delays in its Weekly Updates. Claims for an extension of the Contract Time due to Excused Delays shall be submitted as required under the terms of Section 10.1 herein." Contract (ECF No. 86-1, at 30). ARCO/Murray claims that, as required by the first sentence of Section 8.2.3, it "provided written notice of events giving rise to Excused Delays in its Weekly Updates." Pl.'s Opp'n (ECF No. 91, at 20). Additionally, ARCO/Murray argues that because it "seeks only an adjustment to the Contract Price" and "has never sought any express 'extension of Contract Time,'" the second sentence of Section 8.2.3 requiring notice under the terms of Section 10.1 does not apply. Id. In sum, taking Section 8.2.2 and Section 8.2.3 together, ARCO/Murray's position is that Excused Delays caused by Owl Creek entitled it to an extension of general conditions, the contract only required notice of the Excused Delays via the Weekly Updates, and that ARCO/Murray complied with that requirement.

---

[10] The term "Contract Time"—a defined term—refers to all the Project dates collectively, including the Commencement Date, Substantial Completion Date, and Final Completion Date. Contract (ECF No. 86-1, at 5).

[11] As defined in Section 8.2.1, an "Excused Delay" occurs when ARCO/Murray "is delayed in the commencement or performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of [ARCO/Murray], its Subcontractors or anyone for whom [ARCO/Murray] is responsible." Contract (ECF No. 86-1, at 30). Excused Delays include, but are not limited to, delays due to "acts or omissions of [Owl Creek]." Id.

ARCO/Murray makes two additional arguments in support of its position that Section 10.1.1 does not apply. Id. at 21. First, the Contractor claims that, "by its terms, § 10.1.1 only applies to an 'event' or 'occurrence' giving rise to a claim for relief." Id. In ARCO/Murray's view, it was "OCE's pattern and practice of slow decision-making and changes in design" that "cumulatively delayed the Project," rather than any "acute 'event' or 'occurrence.'" Id. Second, ARCO/Murray contends that Section 10.1.1's 21-day notice window "only applies 'in the absence of any specific notice requirement,'" meaning that Section 10.1.1 "accounts for the fact that sections like § 8.2.3 can take priority when determining the applicable notice requirement." Id.

Alternatively, ARCO/Murray argues that even if Section 10.1.1 does apply, that section does not bar ARCO/Murray's claim because it "does not make notice a condition precedent to adjustment of the Contract Price." Id. In other words, ARCO/Murray contends that Section 10.1.1 "only requires that the parties 'shall provide written notice' to the other party," and "does not contain an express bar of claims if notice is not timely provided." Id. In support of its position, ARCO/Murray cites a number of cases barring claims when notice was not properly given and the contract expressly provided that proper notice was a condition precedent to recovery. Id. at 21–22. ARCO/Murray claims that the reverse implication of those holdings—specifically, that claims are not barred when the contract lacks a provision expressly making notice a condition precedent to recovery—has been adopted by Virginia courts, citing ADC Fairways Corp. v. Johnmark Const., Inc., 231 Va. 312, 316 (1986). Id. at 22.

ARCO/Murray makes two final arguments in support of its position on the issue of notice. First, it argues that Owl Creek "has not alleged or demonstrated any prejudice to Owl Creek as a result of the alleged untimely notice." Id. ARCO/Murray implies that this is a relevant factor to consider by citing Amec Civ v. Commonwealth, No. 06-0340-00, 2008 Va. Cir. LEXIS 3390, at

12

*12 (Danville Cir. Ct. Feb. 12, 2008) for the proposition that a lack of prejudice can constitute an implicit waiver of a contract's notice requirement, and State Farm Fire & Cas. Co. v. Walton, 244 Va. 498, 504 (1992) for the proposition that prejudice is a relevant factor to assess when adjudicating contractual notice disputes. Id. at 22–23. It also argues that "[t]he question of timely notice is generally for the factfinder," and therefore should be left for resolution at trial—especially considering that ARCO/Murray heavily disputes Owl Creek's claim that sufficient notice was not provided. Id. at 23 (quoting Mount Vernon Realty, Inc. v. St. Paul Ins. Co., 19 Va. Cir. 203, 204 (1990)).

In its reply brief, Owl Creek disputes ARCO/Murray's contention that Section 10.1.1 of the contract does not apply, arguing that "Sections 8.2.3 and 10.1.1 are harmonious, and when read together, bar ARCO's claim." Def.'s Reply (ECF No. 92, at 8). Because Sections 8.2.1 and 8.2.2 respectively establish ARCO/Murray's rights to an extension of the Contract Time and an adjustment of the Contract Price following Excused Delays, Owl Creek argues that Section 8.2.3's incorporation of Section 10.1.1's notice requirements is meant to apply to requests for both types of changes—not changes of the Contract Time alone, as ARCO/Murray contends. Id. at 9–10. Owl Creek also disagrees with ARCO/Murray's "absurd" claim that Section 10.1.1 does not apply because the alleged Owl Creek delays were a pattern or practice rather than an "event" or "occurrence," id. at 11, and reiterates its claim from its opening brief that ARCO/Murray failed to provide notice as required by Section 10.1.1, id. at 12–13.

First, I agree with Owl Creek that Section 10.1.1 of the contract applies because Section 8.2.3 expressly incorporates Section 10.1.1. As set forth above, Section 8.2.3 states that "[ARCO/Murray] shall provide written notice of events giving rise to Excused Delays in its Weekly Updates. Claims for an extension of the Contract Time due to Excused Delays shall be

13

submitted as required under the terms of Section 10.1 herein." Contract (ECF No. 86-1, at 30). ARCO/Murray argues that this express language does not contemplate incorporation of Section 10.1.1's notice requirements with respect to adjustments of the Contract Price—but that reading ignores the purpose and scope of Section 8. Because Sections 8.2.1 and 8.2.2 give ARCO/Murray the right to an extension of both the Contract Time and the Contract Price, it stands to reason that the notice section that follows also applies to adjustments of the Contract Time and the Contract Price—especially given that both adjustments are triggered by an Excused Delay, notice of which is also addressed in Section 8.2.3. Thus, I find that ARCO/Murray is not automatically entitled to an adjustment of the Contract Price under Section 8.2.2 as it asserts because under Section 8.2.3 it was first required to provide Section 10.1.1-compliant notice of the Excused Delay giving rise to its claim for price adjustment. I also am unconvinced by ARCO/Murray's contention that Section 10.1.1 does not apply because Owl Creek's "pattern" or "practice" of slow decision-making does not constitute an "event" or "occurrence"—as Owl Creek rightly notes, a pattern or practice is a form or series of events, and the plain language of the contract does not suggest that ARCO/Murray's alternate interpretation should be adopted here.

Having determined that Section 10.1.1 applies, the issue is whether Section 10.1.1 operates to bar ARCO/Murray's claims as a matter of law, given the evidence of notice contained in the summary judgment record. I conclude that it does not. ARCO/Murray has provided extensive evidence that Owl Creek had notice of the delays and of the Contractor's request for an extension of the General Conditions. These include: (1) the parties meeting on July 28, 2020, at which the General Conditions Summary was presented, see Pl.'s Opp'n., Ex. 26 (ECF No. 91-30, at 2, 5); (2) the August 4, 2020, email sending the General Conditions Summary to Owl Creek, Pl.'s Opp'n, Ex. 5 (ECF No. 91-5, at 2); (3) proposed Change Order 8, which included a line item for

14

the cost increase requested in the General Conditions Summary, Pl.'s Opp'n, Ex. 26 (ECF No. 91-30, at 5); (4) the Weekly Updates logging all of Owl Creek's overdue action items and advising that these items were "impacting [ARCO/Murray's] ability to schedule activities and notify subcontractors of upcoming work," see Pl.'s Opp'n, Ex. 6A–6E (ECF Nos. 91-6–91-10); and (5) ARCO/Murray's August 2020 emails explaining that "[t]here are some items that we do not have answers/resolutions to that may affect the schedule," and that the Contractor could not finish the Project without "answers/direction" on "everything we've been talking about for the last two months,"—which would have included the General Conditions increase, see Pl.'s Opp'n, Ex. 7 (ECF No. 91-11, at 3).

A fact finder could rely on this evidence to conclude that Owl Creek had adequate notice of at least some portion of ARCO/Murray's delay claims. Moreover, as ARCO/Murray correctly points out, Section 10.1.1 does not say that ARCO/Murray is barred from bringing claims if notice is not provided. ARCO/Murray cites a number of cases in which claims were barred because the contract at issue contained an express bar to recovery if notice was not given. It argues that the reverse implication—that claims are not barred unless the contract contains an express bar—has been adopted by Virginia courts. Pl.'s Opp'n (ECF No. 91, at 21–22). Owl Creek failed to address this case law or provide contrary case law in its reply brief. While I do not read ARCO/Murray's cited cases to go so far as to clearly establish that Virginia courts have categorically adopted such a rule, I nonetheless conclude on the summary judgment record in this case that any perceived inadequacies of notice under Section 10.1 should not categorically bar ARCO/Murray's delay claims.

The Western District of Virginia's opinion in another construction case, Fluor Fed. Solutions, LLC v. BAE Sys. Ordnance Sys., Inc., No. 7:19-cv-00698, 2021 WL 960645, at *3–5

(W.D. Va. Mar. 15, 2021), is instructive. There, the contract at issue contained a provision requiring notice be given of "any claim, dispute or cause of action arising from or related to this Contract," with no express bar of claims if notice was not properly given. Fluor Fed. Solutions, LLC, 2021 WL 960645, at *3. The court turned to Standefer v. Thompson, 939 F.2d 161, 164 (4th Cir. 1991), which held that "the law generally does not favor conditions precedent, [but courts] may [] construe a contract as conditional if its plain language compels [the court] to do so." Fluor Fed. Solutions, LLC, 2021 WL 960645, at *4. In reliance on Standefer, the court concluded that the general contractor's counterclaim was not barred because "the law does not favor conditions precedent" and "the subcontract does not state that failure to provide notice requires dismissal of any subsequent litigation." Id. at *4–5. Here, as in Standefer, the plain language of the contract does not indicate that notice is condition precedent to a valid claim for delay damages, and the law cited by ARCO/Murray, as well the Standefer court, id. at *4, weighs against construing such a condition in this instance.

Finally, I note that the lack or presence of prejudice to Owl Creek is minimally relevant here and ARCO/Murray's cases suggesting otherwise are distinguishable. The court in Amec Civ concluded that the defendant-owner waived the contractually required notice because it received actual notice from the plaintiff-contractor and acted on that notice—not because it failed to show that it was prejudiced by not receiving the notice it was entitled to under the contract. Amec Civ, 2008 Va. Cir. LEXIS 3390, at *11–12. And the court in State Farm Fire & Cas. Co. did not hold that "prejudice is relevant unless the lack of notice is 'substantial and material,'" as ARCO/Murray suggests, Pl.'s Opp'n (ECF No. 91, at 23)—it held the reverse, that prejudice is not relevant when the failure to comply with the notice requirement in the contract is so substantial and material as to make prejudice irrelevant. See State Farm Fire & Cas. Co., 244 Va. at *504–05. In any event,

16

the court in that case was confronted with a notice provision under an insurance policy, which has a distinct body of case law separate from construction delay claims. See State Farm Fire & Cas. Co., 244 Va. at *500, *503. For those reasons, I conclude that there is a genuine dispute of material fact about whether ARCO/Murray provided satisfactory contractual notice to Owl Creek of the Project delays giving rise to its claim for delay damages.

**B.     There is a genuine dispute of material fact about whether Owl Creek caused the Project delays and whether those delays impacted the Project completion date.**

Owl Creek next argues that ARCO/Murray's claim is "completely foreclosed" because the Contractor has not offered any evidence to prove that Owl Creek's actions delayed the Project's completion date. Def.'s Br. (ECF No. 86, at 16–19). In support of that position, Owl Creek points this court to Techdyn Sys. Corp. v. Whittaker Corp., 245 Va. 291 (1993), which held that "where there is evidence of damage from several causes, for a portion of which defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible." Id. at 16 (citing Techdyn Sys. Corp., 245 Va. at 296). In Owl Creek's view, this case is an example of a situation in which "there is evidence of damage from several causes, for a portion of which the defendant cannot be held responsible" because ARCO/Murray and its subcontractors were themselves responsible for Project delays. See id. at 17–18. In light of that view, Owl Creek argues that ARCO/Murray cannot meet its burden to show "within a reasonable degree of certainty the share of damages for which [Owl Creek] is responsible" because the design-builder has not performed any form of recognized causation analysis (such as a Critical Path Analysis or Time Impact Analysis); performed a basic scheduling analysis; or identified a scheduling expert in its pre-trial disclosures. Id.

17

Owl Creek takes issue specifically with the last of these failures—the failure to identify an expert witness to support ARCO/Murray's argument on the issue of causation. Id. at 18–19. In Owl Creek's view, this failure should foreclose ARCO/Murray's claim on its own because Virginia federal courts have held that "a construction scheduling expert [is] a necessary and vital witness [for claims involving] delay damages." Id. at 17 (citing United States ex rel. Engineered Servs. v. Hanover Ins. Co., No. 4:14cv21, 2015 U.S. Dist. LEXIS 193136, at *23 (E.D. Va. Mar. 11, 2015) and United States ex rel. McKenney's Inc. v. Leebcor Servs., LLC, 2022 U.S. Dist. LEXIS 148633, at *11 (E.D. Va. Apr. 1, 2022)). Owl Creek also cites precedent from the United States Court of Claims confirming that expert testimony is crucial to success on delay damage claims. Id. (citing Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 696 (1966)).

ARCO/Murray disagrees with Owl Creek's reading of the caselaw and argues that Virginia law "only requires that delay damages be proven within a 'reasonable degree of certainty'"—not that an expert witness is required to prove delay damage claims. Pl.'s Opp'n (ECF No. 91, at 23) (citing Techdyn Sys. Corp., 245 Va. at 296). In support of that position, ARCO/Murray points this court to Virginia cases that it claims "found or upheld construction delay damages without discussion of a scheduling expert witness or expert schedule analysis," id. (citing Pebble Bldg. Co. v. G.J. Hopkins, Inc., 223 Va. 188, 190 (1982); Fairfax Cnty. Redev. Hous. Auth. v. Worcester Bros. Co., Inc., 257 Va. 382, 389–90 (1999); and ADC Fairways Corp. v. Johnmark Const., Inc., 231 Va. 312 (1986)), as well as a federal case from Maryland holding that neither an expert witness nor a critical path analysis are required as a matter of law to prove delay damages, id. at 24 (citing Baker DC, LLC v. Baggette Constr., Inc., 378 F. Supp. 3d 399, 411–12 (D. Md. 2019). ARCO/Murray also targets the cases cited by Owl Creek, arguing that Engineered Servs. and McKenney's, Inc. dealt with motions for fee awards and discovery sanctions, respectively, and did

18

not address whether an expert witness or analysis is required as a matter of law to prove a delay damage claim. Id. at 24.

In its reply brief, Owl Creek largely reiterates its claims that expert testimony and formal causation analyses are critical for proving delay damage claims, and that ARCO/Murray has failed to provide any evidence showing "within a reasonable degree of certainty" that Owl Creek caused the Project delays. Def.'s Reply (ECF No. 92, at 13–16). Owl Creek also attempts to distinguish Baker DC, LLC "because [that] action was between a subcontractor (as plaintiff) and a general contractor (as defendant)." Id. at 14. Additionally, Owl Creek contends that the court in Baker DC LLC "found that expert testimony was not necessary because the plaintiff's project manager had performed an analyses of the delay, which was submitted by the plaintiff to the defendant during the court of the project"—something ARCO/Murray failed to do here. Id. at 14–15.

On the issue of causation, I agree with ARCO/Murray that the sufficiency of its evidence of delay is not ripe for resolution on summary judgment. The Contractor has provided evidence that slow decision-making by Owl Creek contributed to the Project delays, including but not limited to: (1) Weekly Updates showing "overdue" action items and advising Owl Creek that its failure to respond to these items was impacting ARCO/Murray's ability to work on the Project, see Pl.'s Opp'n, Ex. 6A–6E (ECF Nos. 91-6–91-10); (2) several emails asking Owl Creek for responses on design decisions affecting the Project schedule and expressing frustration with Owl Creek for failing to provide such responses, see, e.g., Pl.'s Opp'n, Ex. 7 (ECF No. 91-11, at 2–3); Pl.'s Opp'n, Ex. 8 (ECF No. 91-12, at 2); (3) the General Conditions Summary showing that only 71 days of delays unaccounted for in the contract were weather related, see General Conditions Summary (ECF No. 86-5, at 2); and (4) deposition testimony from Owl Creek admitting that it caused delays of some kind, see Pl.'s Opp'n, Ex. 22, at 136:3–4 (ECF No. 26, at 4) ("There were

delays, but they were not of substance."); and (5) meetings minutes and testimony from ARCO/Murray executives.

And while Owl Creek and the case law it cites correctly note the importance of causation analyses and experts in delay damage cases, see Engineered Servs., 2015 U.S. Dist. LEXIS 193136, at *23; McKenney's Inc., 2022 U.S. Dist. LEXIS 148633, at *11; Luria Bros. & Co., 177 Ct. Cl. at 696, I am persuaded that the decision on whether or not to employ such evidence is one that rests with the litigants—not the court, see Pebble Bldg. Co., 223 Va. at 190; Fairfax Cnty. Redev. Hous. Auth., 257 Va. at 389–90; Baker DC, LLC, 378 F. Supp. 3d at 411–12. Given the recognized importance of this evidence in proving delay damage claims, it will likely be very difficult for ARCO/Murray to meet its burden at trial to show "within a reasonable degree of certainty" that Owl Creek is responsible for some or all of the delay damages sought without a scheduling expert or Critical Path analysis. See Techdyn Sys. Corp., 245 Va. at 296. But ARCO/Murray has the right to make that evidentiary decision for itself, and I will not deprive it of the chance to do so as a matter of law on summary judgment. As such, I conclude that there is a genuine dispute of material fact about whether Owl Creek caused at least some Project delays and whether those delays impacted the Project completion date.

**C.    ARCO/Murray's lien waivers do not bar its claims for delay damages.**

Owl Creek also argues that ARCO/Murray "expressly waived [delay damage] claims by the lien waivers it executed in consideration of progress payments on the project." Def.'s Br. (ECF No. 86, at 19).   As stated above, the lien waivers each contained a provision in which ARCO/Murray agreed to "waive and release any and all lien, and claim or right to lien on [the Project] under the Statutes of the State of Virginia relating to Mechanics' Liens, on account of labor or materials, or both." Def.'s Br., Exs. 14, 17–19 (ECF Nos. 86-14, 86-17–86-19).  Citing

that language, Owl Creek stresses that these were "plain and unambiguous waivers of 'any and all lien, and claim or right to lien,'" which ARCO/Murray "knowingly executed." Def.'s Br. (ECF No. 86 at 20). In Owl Creek's view, these lien waivers entitle it to partial summary judgment on ARCO/Murray's delay damage claims. Id.

ARCO/Murray disagrees with Owl Creek's characterization of the lien waiver language. Pl.'s Opp'n (ECF No. 91, at 25–26). It argues that "the plain language of the lien waiver does not precisely and unequivocally evidence that ARCO intended to knowingly waive its claims and causes of action." Id. at 26. To the contrary, ARCO/Murray reads the waivers as a release of "any lien, and claim or right to lien on [the Project] under the Statutes of the State of Virginia relating to Mechanics' Liens, on account of labor or materials, or both." Id. That being the case, ARCO/Murray believes that the waivers "only released its mechanic's lien rights with respect to the property" and were not a release of "all claims and causes of action." Id. As such, ARCO/Murray contends that the waivers "had no effect on [its] breach of contract claim and unjust enrichment claim." Id.

In its reply brief, Owl Creek disputes ARCO/Murray's reading of the lien waiver language, arguing that the design-builder waived any "lien, and claim or right to lien"—including claims for delay damages. Def.'s Reply (ECF No. 92, at 17–18). Put another way, Owl Creek believes that ARCO/Murray waived two distinct types of rights—(1) "any lien, and claim" or (2) the "right to lien on [the Project] under the Statutes of the State of Virginia relating to Mechanics' Liens, on account of labor or materials, or both." Id. at 18. Owl Creek also cites Section 6.2.3 of the contract, which is the provision that required ARCO/Murray to execute the lien waivers in question prior to receiving payment. Id. at 16–17; Contract (ECF No. 86-1, at 26). Section 6.2.3 says that ARCO/Murray's applications for payment "shall constitute [ARCO's] representation that . . . title

21

to all Work will pass to [OCE] free and clear of all claims, liens, encumbrances, and security interests." Def.'s Reply (ECF No. 92, at 16–17). In Owl Creek's view, "the lien waivers are [either] consistent with Section 6.2.3, or ARCO materially breached this provision each time it accepted payment on the Project." Id. at 17.

As both parties observe, waiver is the "intentional abandonment of a known right" and has two elements: (1) "knowledge of the facts basic to the exercise of the right," and (2) "the intent to relinquish that right." Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv. Inc., 267 Va. 642, 651–52 (2004); Bernsen v. Innovative Legal Mktg., LLC, 885 F. Supp. 2d 830, 832–33 (E.D. Va. 2012). Owl Creek reads the waivers to say that ARCO/Murray intended to give up its right to "any lien, and claim," pointing to the use of the word "or" as evidence that the waiver is meant to be read in the disjunctive—(1) "any lien, and claim" or (2) "right to lien"—but that reading is incorrect. The disjunctive language does not signal a choice between those two options, but rather between (1) "claim [to lien]" or (2) "right to lien." This is evidenced by placement of the comma, followed by the word "and" in the phrase "any lien, and claim or right to lien." By this plain reading of the waivers' language, ARCO/Murray gave up any (1) lien, or (2) claim or right to lien. This was merely a waiver of any right ARCO/Murray had to the property on account of labor or materials furnished—not an "intentional abandonment" of any substantive right or cause of action for delay damages. See Va. Polytechnic Inst. & State Univ., 267 Va. at 651–52; Bernsen, 885 F. Supp. 2d at 832–33. Because its Complaint does not seek to extend lien rights to include the delay claims, ARCO/Murray's lien waivers do not bar its contract claim for delay damages.

## IV.   CONCLUSION

For the foregoing reasons, this court DENIES Owl Creek's motion for partial summary judgment on ARCO/Murray's claim for delay damages. (ECF No. 85).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER,
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 5, 2023